George S. Engle v. Commissioner. George S. Engle and Dorothy J. Engle, Husband and Wife, v. Commissioner.
Engle v. Commissioner
Docket Nos. 36585, 36586.
United States Tax Court
T.C. Memo 1954-61; 1954 Tax Ct. Memo LEXIS 185; 13 T.C.M. (CCH) 520; T.C.M. (RIA) 54167; 3 Oil & Gas Rep. 1169; June 11, 1954, Filed Carl F. Bauersfeld, Esq., and Robert Ash, Esq., 550 Munsey Building, Washington, D.C., for the petitioners. Neuman A. Townsend, Jr., Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion These consolidated proceedings involve deficiencies in income tax as follows: Petitioner
Year
Amount
George S. Engle
1946
$18,630.64
George S. Engle and
Dorothy J. Engle
1947
106,720.23
1948
193,852.48
The sole contested issue is whether the gain on the sale of interests in oil leases and royalties in the taxable years involved is taxable as ordinary income or as capital gain. The stipulated facts are found accordingly. Findings of Fact The petitioners, George S. Engle and Dorothy J. Engle, are husband and wife, residing at Coral Gables, Florida. For the year 1946 George *186 S. Engle filed an individual return with the collector of internal revenue for the eighth Illinois district, at Springfield, Illinois. For the years 1947 and 1948 George S. Engle and Dorothy J. Engle filed a joint return with the collector of internal revenue for the district of Florida. Since Dorothy J. Engle is a petitioner solely because of filing a joint return, George S. Engle will hereinafter be referred to as the petitioner. The books and records of the petitioner were kept on the cash receipts and disbursements and calendar year basis of accounting. Petitioner has been engaged in the oil business since 1918 when he started as an oil scout. In 1920 a new oil field was opened in Bowling Green, Kentucky, and petitioner purchased a cable tool drilling rig and drilled in and around Bowling Green until 1922, when he went to Owensboro where he operated until 1938. During the taxable years 1946, 1947, and 1948, petitioner was associated with Charles M. Moon, W. Van Alan Clark, and Wallace Groves in the exploration, drilling, and development of wildcat leases. Petitioner would acquire a lease in his own name, clear title to the property, and prepare it for drilling. Petitioner *187 first met Moon, an attorney in Miami, Florida, in 1936. They started drilling wells in 1936 and have since continued that association. In 1938 a large oil field was opened in Salem, Illinois. After petitioner made a survey of the possible uses of residue gas which was being burned and wasted, he decided to construct an absorption plant for making natural gasoline, butane, isobutane, and propane. A corporation known as the Sunflower Company was formed to operate the absorption plant and petitioner served as its president and general manager from 1939 until 1945. The corporation was financed by M. M. Wheeler and Morris F. LeCroy, members of the investment banking firm of Paine, Webber, Jackson and Curtis, of New York, New York, and W. Van Alan Clark, of Suffern, New York. In 1945 the petitioner, Groves, and Moon organized the Engle Petroleum Company which purchased the assets of the Sunflower Company. The stock of the Engle Petroleum Company was owned 48 per cent by petitioner, 28 per cent by Groves, and 24 per cent by Moon. Engle Petroleum was financed by Groves' loaning the company $300,000 and by giving a note to Wheeler for $100,000. The Engle Petroleum Company operated the *188 absorption plant until the gas gave out. It was dissolved some time in 1951. Groves is an industrialist and financier of Baltimore, Maryland. W. D. Hart is a representative of Groves and handles some of his business affairs. In 1946 Groves wanted to become associated with the petitioner in the business of acquiring oil leases and in their exploration and development. On April 18, 1946, the petitioner, Groves, and Moon entered into a contract for the purpose of acquiring leases for the exploration, drilling, and development of said leases, and, if found productive, for the purpose of developing them for oil and gas-producing purposes. Groves was to provide all financing for the operation. The parties operated under this agreement for a period of five or six months. After the termination of the April 18, 1946, agreement, Moon, Groves, and Clark continued to be associated with the petitioner in the acquisition, exploration, and development of wildcat leases, with the understanding that petitioner would assign to them such interests as he determined. There was no legally enforceable agreement obligating petitioner to permit them to participate in wildcat ventures. Petitioner has had *189 an interest in producing leaseholds as an operator since 1921. An oil operator is a person who acquires oil leases, drills, and, if oil is found, equips the wells to produce oil and thereafter maintains the wells until the oil is extracted and sold. During the period 1939 to 1945 the petitioner's oil-producing activities were minor and most of his time was spent in connection with the gasoline absorption plant operated by the Sunflower Company and its successor, the Engle Petroleum Company. From 1943 through the tax years involved the petitioner's wildcatting activities "progressed pretty fast." Beginning in 1943 the petitioner had offices in Salem, Illinois, for two or three years. His offices were moved to Mt. Carmel, Illinois, for a couple of years, and then to Evansville, Indiana, where he now has offices. The petitioner maintains a complete organization for finding and producing oil, including geologists and land, map, and bookkeeping departments, and employs between 60 to 75 people. He has a superintendent who is in charge of all field operations, a field man, maintenance men, pumpers, roustabouts, and every character of employee required from the time the well is started *190 until the well is put on the pipe line and the oil sold to the pipe lines. The number of producing leaseholds held by the petitioner increased from 16 in 1944 to 48 in 1951. The gross oil production increased from $28,415.78 in 1944 to $456,307.27 in 1951, as follows: Producing
Gross oil
Year
leaseholds
production
1944
16
$ 28,415.78
1945
15
68,602.42
1946
19
140,601.10
1947
29
404,488.81
1948
40
374,692.27
1949
38
289,299.59
1950
45
280,982.02
1951
48
456,307.27
During the taxable years 1946 to 1948, inclusive, the petitioner's gross production, intangible drilling costs, and depletion deduction were as follows: Gross
Intangible
Depletion
Year
production
drilling costs
deduction
1946
$140,601.10
$155,255.28
$19,351.79
1947
404,488.81
461,184.19
76,671.47
1948
374,692.27
616,134.67
62,882.11
The petitioner's net loss and the value of leaseholds and royalties which expired or became worthless were as follows: Year
Net loss
Leaseholds
Royalties
1946
$ 85,867.78
$18,358.81
1947
285,971.20
19,297.68
$13,273.72
1948
531,979.00
65,326.46
18,191.18 The petitioner *191 received income from royalties in the amount of $1,090.80 in 1946, $22,272.13 in 1947, and $5,186.71 in 1948. The number of nonproducing leases owned by petitioner and their book value as of December 31, 1946, 1947, and 1948, were as follows: Number of
nonproducing
Year
leases
Book value
1946
6
$ 6,368.80
1947
31
35,242.84
1948
35
53,145.35
As of December 31, 1946, the petitioner did not own any interests in nonproducing royalties. As of December 31, 1947, he owned an interest in 12 nonproducing royalties having a book value of $20,656.25, and as of December 31, 1948, he owned interests in 4 nonproducing royalties having a book value of $4,606.87. During the years 1947 to 1951, inclusive, the petitioner drilled wells as follows: 1947
68
1948
85
1949
50
1950
54
1951
68 At the time of the hearing of this proceeding petitioner operated between 170 and 180 producing oil wells. On March 19, 1943, the petitioner acquired a 1/2 interest in an oil lease known as the John K. Cogan lease. Clark, Moon, and one Robert Rew joined with petitioner in the development of this property and received the following interests in the lease *192 from the petitioner: Date of
Interest
Name
assignment
assigned
Robert Rew
5-18-43
1/16
W. Van Alan Clark
6-15-43
1/8
Charles M. Moon
3- 3-45
1/32
Subsequent to March 19, 1943, the petitioner purchased additional interests in the Cogan lease, as follows: Purchased from
Date
Interest
Cost
E. E. Martin
10- 8-43
1/8
unknown
T. M. Bane
10- 8-45
1/4
$15,000
E. E. Martin
10-31-45
1/8
7,500 The first producing well was completed on the Cogan lease in October 1945. Four additional producing wells were completed by February 1946. At the time petitioner acquired the 1/2 interest in the Cogan lease in 1943 it was nonproducing. His purpose in acquiring the lease was to drill and develop it. T. M. Bane owned the other 1/2 and had drilled a small oil well on the property with cable tools. After the petitioner acquired additional interests from Bane and E. E. Martin in 1945, he decided to develop the property further and ultimately drilled 10 or 11 producing wells on the lease. On November 9, 1945, petitioner assigned a 1/4 interest in the Cogan lease to the Engle Petroleum Company for $20,000. On July 27, 1946, he sold a 1/8 interest *193 to Groves and W. D. Hart for $60,000, realizing a gain of $57,754.44, which was reported as a long-term capital gain. The respondent determined the gain was ordinary income. In 1946 petitioner sold a 1/8 interest in the Cogan lease to Groves and Hart because they had shared in past ventures. Groves wanted some income from oil to help carry his wildcat ventures. The Cogan lease is still producing and the petitioner is the operator and owns an interest in the lease. On January 29, 1944, petitioner purchased a 1/2 interest in the Clifton Wood lease from Bane, who owned the entire working interest in the lease which covered an 80-acre tract. Immediately thereafter petitioner transferred a 1/16 interest to Clark. Bane had drilled a small oil well which was not a commercial producer and in April 1946 Bane sold his 1/2 interest to petitioner for $1,250. The petitioner thereupon transferred a 2/16 interest to Moon. The petitioner felt morally obligated to comply with Moon's request to sell him an interest because of their long association. After Bane's additional 1/2 interest was acquired by the petitioner he proceeded to drill additional oil wells and 8 of the wells were completed *194 as producers. On March 6, 1947, petitioner transferred a 13/64 interest in the Wood lease to Groves for $125,000. On his 1947 return the petitioner reported a long-term capital gain of $114,638.74. The parties have stipulated the gain to be $114,879.68, which amount the respondent determined to be ordinary income. Groves had insisted that petitioner transfer to him an interest in the Wood lease. The petitioner felt obligated to comply with the request because of their association in drilling and in developing other ventures and petitioner desired to maintain their friendship. Attached to the Wood lease was an overriding royalty owned by some people in Houston, Texas. After production was obtained the petitioner received a wire from the owners of the overriding royalty which stated that they were not operating in Illinois and desired to sell. The petitioner purchased the overriding royalty for $5,000. In 1947 the petitioner was approached by the Ditchik Brothers and sold to them two 1/64 interests in the overriding royalty for $25,000. The reason for selling the royalty interest was because petitioner was offered more for it than he thought it was worth. On May 4, 1948, petitioner *195 sold his remaining interest in the Wood lease, together with his 1/32 interest in the overriding royalty, to the Indiana Farm Bureau Cooperative Association, Inc., of Mt. Vernon, Indiana, for $675,000. The gain of $622,506.72 realized was reported by petitioner as a long-term capital gain. The respondent determined it to be ordinary income. The circumstances surrounding the sale are that the purchasers were oil operators, refiners, and pipeline operators, and were in need of crude oil for their refinery. Alfred Kiltz, representing the purchaser, went from Evansville, Indiana, to Miami, Florida, and made an offer to purchase several properties owned by the petitioner in Kentucky, Indiana, and Illinois. The petitioner told Kiltz that he had no production for sale and wanted to keep his production. Kiltz offered $500,000 for the Wood lease but petitioner stated that he was not interested in selling it. Later, Kiltz made another trip to Miami and offered the petitioner $600,000. The petitioner again advised Kiltz that he was not interested in selling. Later, either by wire or telephone, an offer of $675,000 was made. Due to various factors existing in the oil deposit the petitioner did *196 not see how he could ever hope to operate the lease and recover anywhere near $675,000 of oil from it, and for those reasons he accepted the offer of $675,000 for his interest. In 1944 the petitioner acquired a 41/64 interest in the Breen lease. During 1947 he transferred a 2/64 interest to Clark for $4,000, realizing a gain of $3,212, which was reported as a long-term capital gain on his 1947 return. The respondent determined it was ordinary income. When the petitioner acquired the Breen lease in 1944 it had 2 or 3 wells that were drilled in 1925. While they were productive they were very small. The petitioner drilled additional wells in the center of the Breen lease which proved to be good productive wells. After the new wells were obtained Clark approached the petitioner and wanted an interest. Because Clark was associated with him in other wildcat ventures the petitioner felt obligated to let him have a 1/32 interest in the Breen lease. On May 17, 1947, the petitioner acquired oil leases known as the Fleener and Mauck leases. Groves and Clark participated in the exploration and development of these leaseholds. The petitioner's interest was 23/32, Groves' 8/32, and Clark's *197 1/32. The first producing well was completed on May 27, 1947, and 5 additional producing wells were completed during June and July 1947. The petitioner sold his 23/32 interest to the Indiana Farm Bureau Cooperative Association, Inc., on December 1, 1947, for $168,600.77, realizing a gain of $126,344.11, which amount he returned as a long-term capital gain. The respondent determined it to be ordinary gain. The reason the petitioner accepted the offer to purchase his interest in the Fleener and Mauck leases was that petitioner found that, in drilling, the oil was contained in a very thin body of sand known as "stray sand." The sand was only two or three feet in thickness and contained water. Petitioner knew the oil sands would not cover more than 45 acres and thought the amount of $168,600.77 was more than he could realize by producing oil under the lease. In 1946 the petitioner transferred to his associates interest in 5 wildcat leases. He transferred 33 interests in 1947 and 24 interests in 1948. The reason the petitioner transferred interests in wildcat leases to his associates was that they wanted to participate and he felt obligated to them because of his prior association *198 with them. In his tax returns for 1946, 1947, and 1948, the petitioner reported gains from the wildcat lease transactions with his associates. In calculating the gain the only costs that were considered was the direct cost of procuring the leases. The administrative and overhead expenses connected therewith were charged on the books of the petitioner as expenses of his business and were so reported on his tax returns. For the year 1946 the petitioner had a gain from wildcat lease transactions with his associates of $5,643.75. At the same time he had a net investment in the leases of $18,461.21. For the year 1947 the petitioner had gains from wildcat lease transactions with his associates of $122,163.88, less $49,130 gain on a transaction with Groves and Hart on the second Kentucky block lease hereinafter mentioned, and less royalty transactions of $21,725.62, or net gains on wildcat lease transactions of $51,308.26. At the same time he still had a net investment in the leases of $77,510.43. In the year 1948 petitioner had a gain from wildcat transactions with his associates of $86,451.73. At the same time he had a net investment in the leases of $207,411.99. In 1947 petitioner *199 transferred a 17/32 interest to Groves and Hart in the second Kentucky block lease, above referred to, for $60,525.40, and reported a gain of $49,130 for that transaction. The circumstances surrounding the transaction were that petitioner had drilled a well on the James Dixon farm which yielded 800 barrels a day. Previously, petitioner, Groves, Moon, and Hart had acquired a large block of leases covering 10,000 acres in that area. At that time the associates decided they did not want to lease any more acreage. Petitioner obtained additional leases and after drilling on the James Dixon lease Groves insisted that he be allowed an interest in the second Kentucky block obtained by petitioner. Because Groves had been associated with him in the development of wildcat leases petitioner transferred the interest to Groves and his representative, Hart. Petitioner has not been interested particularly in buying or owning royalty interests. Occasionally, when a landowner offers him a royalty interest on property that he operates and is familiar with he will purchase it. Primarily, he devotes his attention to oil drilling, producing, and development of leases. When he acquired royalties he contemplated *200 keeping them. During the year 1948 the petitioner sold interests in producing oil royalties as follows: Name of royalty
Interest sold
Purchasers
Gain or loss
Jourdan
2/64
Charles Moon
$ 1,500.00
Jourdan
1/64
Harry Buttroff
(1,150.00)
Ungenthum
1/64
Charles Moon
1,000.00
Pritchett-Hobgood
1/16
New York group
50,993.86
Prior to their sale these royalty interests had been held for less than six months and the net gain was reported in 1948 as a short-term capital gain. No adjustment was made with respect to these gains by the respondent in determining his deficiency. The above royalties were actually purchases on behalf of Moon and Buttroff. The circumstances surrounding the acquisition and transfer of such royalty interests are that Moon was in Europe when the petitioner brought in some new production in which Moon did not own an interest. Upon his return he requested the petitioner to obtain some royalties for him, which the petitioner did, and at the same time he obtained a royalty for Buttroff, his banker friend of Owensboro, Kentucky. The sale of the Pritchett-Hobgood royalty to the New York group was a sale to outside interests. The *201 Pritchett-Hobgood leases adjoined the Dixon oil field operated by the petitioner. One well and one dry hole had been drilled on the Hobgood lease. On the Pritchett lease there was a small well which looked as if it would be largely a gas well. The New York group requested the petitioner to sell them his royalty interest in the Pritchett and Hobgood leases and, as petitioner thought the price offered was exceptionally good, he accepted it. The petitioner owned an interest in producing royalties as of December 31, 1946, 1947, and 1948, as follows: Year
Number
Net value
1946
2
$ 5,403.44
1947
6
10,117.43
1948
5
6,589.78
It was always the petitioner's intention in acquiring wildcat leases to drill for the purposes of discovering oil and deriving income from the production. The petitioner never purchased any wildcat lease or producing lease for the purpose of resale. After oil was found the petitioner always held the lease for income. The only commercially profitable leases in which the petitioner has sold his entire interest were the Wood lease and the Fleener and Mauck leases. In 1947 the petitioner had two transactions with the Central Pipe Line *202 Company, oil and pipe line operators. These involved the Adams and Benson leases. Central owned leases adjoining those owned by the petitioner and requested petitioner to drill a test well. The petitioner agreed and they joined with petitioner by purchasing a 1/2 interest in the Adams and Benson leases. During 1947 and 1948 the petitioner and his associates had several transactions with the Indiana Farm Bureau Cooperative Association, Inc., as joint venturers in the acquisition and exploration of wildcat leases. They joined together in the drilling of the Belnap fields near Evansville, Indiana. In 1949 the petitioner and associates had a written agreement with the cooperative association for such purposes. Oil operators join together in the acquisition and development of wildcat leases to spread the risk and have the advantage of the joint knowledge of their geological departments and other facilities. In 1948 the petitioner transferred his interest in the W. F. Gardner lease to the Gulf Oil Company. The reason for the transfer was that the lease was about to expire and Gulf had other leases in that particular area. This was the only wildcat or nonproducing lease in which the petitioner *203 has sold his entire interest. In 1948 the petitioner transferred a fractional interest in the Victor Lamey lease to E. L. Newton, an oil operator in Owensboro, Kentucky, who had other leases in that area. Newton wanted to see the area developed but did not want to take the responsibility of drilling a well himself. Newton agreed to pay the petitioner $15,000 for a turnkey job, whereby Newton received a 3/4 interest and the petitioner retained a 1/4 interest in the lease. In 1947 petitioner transferred a fractional interest in the Ruppert Sales lease to L. Ditchik. The circumstances surrounding the transaction were that Ditchik had purchased an overriding royalty in the Wood lease from petitioner and wanted an interest in drilling a well. Petitioner sold him a 1/8 interest in the Ruppert Sales lease for $3,500. The lease was drilled and proved nonproductive. The petitioner does not have a broker's license and has never held himself out as a dealer or broker in oil properties. He does not employ salesmen or a sales force to sell oil and gas leases or royalties. Petitioner has never advertised any lease or royalty interest in oil or gas for sale and has never solicited anyone to *204 sell them an interest in either a producing or nonproducing leasehold. The leases, royalties, and interests sold by the petitioner in the taxable years in question were not properties held for sale in the ordinary course of his trade or business as an oil operator. Opinion LEMIRE, Judge: The question presented is whether the gains realized from the transfer and sale of oil properties are entitled to capital gains treatment or represent ordinary income realized from the sale of properties held primarily for sale in the ordinary course of petitioner's trade or business, as determined by the respondent. The issue is one of fact, with the burden upon the petitioner to overcome the respondent's determination. King v. Commissioner, 189 Fed. (2d) 122, certiorari denied, 342 U.S. 829; Mauldin v. Commissioner, 195 Fed. (2d) 714. We have recognized that no single test is decisive. Walter R. Crabtree, 20 T.C. 841. In determining the ultimate fact various weight has been given to such factors as continuity and frequency of sales, activity of the seller or those acting on his behalf, the purpose for which the property was acquired, the *205 purpose for which it was held, and other facts indicating that the sales were in furtherance of the occupation of the taxpayer. The courts have generally held that the factor which must be given the greatest weight is the purpose for which the property was held during the period in question. Vern W. Bailey, 21 T.C. - (Feb. 9, 1954); Walter R. Crabtree, supra; and Mauldin v. Commissioner, supra.
The record establishes that the petitioner has been an independent oil operator and producer since 1920, and his method of operation is the same as is employed by other independent oil operators and producers. The evidence shows that it was always his intention in acquiring leases to drill for the purposes of discovering oil and deriving income from the production. If oil was found the petitioner usually held the lease for income. The only commercially profitable leases in which he has sold his entire interest were the Wood lease and the Fleener and Mauck leases. All other producing leases he has operated to their economic limit. During the period 1947 to 1951, inclusive, the petitioner drilled from 50 to 85 wells each year. Associated with the petitioner in his *206 oil operations during the taxable years in question were Charles M. Moon, W. Van Alan Clark, and Wallace Groves. Moon had theretofore been associated with the petitioner in the acquisition and exploration of wildcat leases. Moon's association commenced in 1936, Clark's in 1943, and Groves' in 1945. The petitioner, as the operator, would acquire a wildcat lease in his own name, clear the title, and arrange for the drilling of the test well. Petitioner would then execute an assignment of a fractional part of the lease to his various associates and would invoice them for a pro rata part of the acquisition cost and an estimated amount for overhead and administrative expenses. If the lease proved to be a commercial producer the petitioner continued to operate the lease to complete the well, drill additional wells, and invoice the associates for their pro rata share of the actual operating costs. During the taxable years in question the petitioner made 6 sales of interests in oil-producing leases and 2 sales of royalty interests. Four of these sales were to the associates Moon, Clark, and Groves, and 2 of the sales were to the Indiana Farm Bureau Cooperative Association, Inc. The 2 sales *207 of royalty interests were made to Ditchik Brothers. In our findings of fact we have set forth the circumstances surrounding these transactions and the reasons for the transfers. To review these again here would only serve to lengthen this opinion. The sales here in question involve producing properties. Each of the properties was acquired in connection with petitioner's business as an oil operator. The petitioner is still operating the Cogan and Breen leases. The Wood lease was acquired by the petitioner in 1944. He developed and operated it for over four years prior to its sale on May 4, 1948, to the Indiana Farm Bureau Cooperative Association, Inc. The petitioner acquired the Fleener and Mauck leases on May 17, 1947, and drilled, developed, and operated the leases until the sale on December 1, 1947. This record, we think, clearly establishes that the petitioner's acquisition of the oil properties in question and his conduct during the holding period was for the purpose of developing and exploiting the oil and gas resources in connection with his business as an oil operator. The petitioner admittedly was not a licensed oil broker. He never solicited purchasers, did not employ *208 salesmen or agents, and never advertised oil properties for sale. The number, continuity, and frequency of the sales were not of such a character as to indicate that they were made in the course of petitioner's business. We have, therefore, found as an ultimate fact that the oil properties and royalty interests sold in the taxable years in question were not held for sale to customers in the ordinary course of the petitioner's trade or business. Accordingly, we hold that the oil interests and the royalty interests which the petitioner sold in the taxable years involved are capital assets held for more than six months and the realized gains merit capital gains treatment under section 117 of the Internal Revenue Code. Other issues raised by the pleadings are disposed of by stipulation. Decision will be entered under Rule 50.